## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 6:22-cr-3-JDK |
| | § | |
| SUSAN L. HERTZBERG, ET AL. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Following a jury trial, Defendants Jeffrey Madison, Susan Hertzberg, Matthew Theiler, David Kraus, and Thomas Gray Hardaway moved for judgments of acquittal, or alternatively, for a new trial. Docket Nos. 1009 (Kraus), 1049 (Madison), 1050 (Hertzberg), 1051 (Hardaway), 1055 (Hardaway), 1061 (Theiler), 1064 (Kraus). For the reasons stated below, the Court **DENIES** the motions.

## I. INTRODUCTION

On January 12, 2022, the grand jury charged eighteen Defendants with conspiracy to commit illegal remunerations in violation of 18 U.S.C. § 371. Docket No. 1. The indictment alleged a years-long conspiracy to pay physicians across Texas to refer their patients to two rural Texas hospitals, Little River Healthcare and Stamford Hospital, for laboratory tests performed by Boston Heart Diagnostics. To conceal the conspiracy, the conspirators invited the physicians to join management service organizations (MSOs), which did not provide any "services" but in fact remunerated the physicians for their patient referrals. The conspiracy included remuneration for tests that were later reimbursed by federal payors.

1

Five Defendants—Madison, Hertzberg, Theiler, Kraus, and Hardaway—proceeded to trial.  Madison is the former Chief Executive Officer of Little River.  The others are former officers and employees of Boston Heart:  Hertzberg is the former Chief Executive Officer, Theiler is the former Vice President of Sales and Marketing, Kraus is a former Regional Sales Director, and Hardaway is a former Sales Representative.

The case was tried to a jury over a six-week period—from October 16 to November 28, 2023.  At trial, the Government presented the testimony of twenty-three witnesses, including from co-conspirators Dr. Jason DeMattia (Trial Tr. 628–747), Ruben Marioni (*id.* 749–1166), Todd Cook (*id.* 1205–1743), Jeff Parnell (*id.* 1749–2108), Dr. Heriberto Salinas (*id.* 2109–65), Christopher Gonzales (*id.* 2190–2488), Laura Howard (*id.* 2676–3085), and Robert O'Neal (*id.* 4755–5070). The case agent, Jack Geren, also testified for the Government (*id.* 3509–4165).  The Government, moreover, introduced nearly 500 exhibits to establish the elements of the charged crime against each of the Defendants.

Following the close of the Government's case-in-chief, Defendants moved for judgments of acquittal.  *Id.* 5151–5209.  The Court reserved decision on the motion. *Id.* 5209.  Defendants then presented testimony from three witnesses in their cases-in-chief:  Dr. Jonathan Sheinberg (*id.* 5234–5403), the initial physician who worked with Boston Heart and Little River; Rosalynn Gill (*id.* 5404–53), a colleague of Hertzberg while at Boston Heart; and Ryan Downton (*id.* 5489–5806), former in-house counsel for Little River.  Defendants rested after two days of testimony.

2

The Court notes that, despite the length of trial and detailed evidence, the twelve jurors and two alternates were attentive, diligent, and conscientious.  Nearly every juror took copious notes throughout the trial.  They listened to the testimony carefully, reviewed the exhibits as they were admitted, and performed their service admirably.  The Court is immensely grateful for their service.  The case was submitted to the jury on November 28, 2023.  Two days later, the jury unanimously returned guilty verdicts for all five Defendants.  *Id.* 6272–73; *see also* Docket No. 1020.

The post-verdict motions followed.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29(c) permits a defendant to move for a judgment of acquittal after a guilty verdict.  The "relevant question" in deciding a Rule 29 motion "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Valle*, 538 F.3d 341, 344 (5th Cir. 2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see also United States v. Hernandez-Palacios*, 838 F.2d 1346, 1348 (5th Cir. 1988) (explaining that the Court must "giv[e] the Government the benefit of all reasonable inferences and credibility choices").  "The standard for a sufficiency claim is high."  *United States v. Achobe*, 560 F.3d 259, 263 (5th Cir. 2008); *see also United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) ("Our review of the sufficiency of the evidence is 'highly deferential to the verdict." (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002))).  "The jury's constitutional role in deciding

criminal trials leaves little room for judicial second-guessing." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc).  Review of a jury verdict is therefore "quite limited." *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)); *see also Moreno-Gonzalez*, 662 F.3d at 372 ("We must ensure that our inquiry is 'limited to whether the jury's verdict was reasonable, not whether we believe it to be correct.'" (quoting *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001))).  "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999).

Federal Rule of Criminal Procedure 33(a) also permits a defendant to seek a new trial "if the interest of justice so requires."  A new trial should be granted "only in exceptional cases." *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997); *see also United States v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018) (stating that a new trial is an "exceptional remedy.").  There are two such "exceptional cases" for granting a new trial. *Crittenden*, 46 F.4th at 296–97.  The first is when "error infects the trial—perhaps the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions." *Id.* at 296; *see also Hoffman*, 901 F.3d at 552 ("A new trial request can also be based on procedural problems with the trial if they caused a miscarriage of justice.").  The second is when the evidence weighs "heavily against the verdict." *Crittenden,* 46 F.4th at 297 (quoting *Robertson*, 110 F.3d at 1118).  In considering a new trial, the Court may not "reweigh the evidence and set aside the verdict simply because it feels some other

result would be more reasonable." *Robertson,* 110 F.3d at 1118.  Rather, a new trial should be granted only if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.*; *see also United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (stating that, in deciding a Rule 33 motion, a court must not "entirely usurp the jury's function . . . or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate.").  Deciding a Rule 33 motion is within the Court's discretion, but such discretion "should be exercised with caution." *Robertson*, 110 F.3d at 1120 n.11.

### III. DISCUSSION

Defendants each moved for a judgment of acquittal, which the Court addresses in Part A below.  They also alternatively moved for a new trial, which is addressed in Part B.

### A. Motions for Acquittal

In their motions for acquittal, Defendants primarily argue that no reasonable juror could have found them guilty of conspiracy to commit illegal remunerations beyond a reasonable doubt.  After viewing the evidence in the light most favorable to the Government, *see Valle*, 538 F.3d at 344, the Court disagrees.

As noted above, Count One of the Indictment charged Defendants with conspiracy to commit illegal remunerations in violation of 18 U.S.C. § 371.  Docket No. 1.  To convict under § 371, the Government must prove beyond a reasonable doubt:

> (1) an agreement between two or more persons to pursue [the] unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*United States v. Marchetti*, 96 F.4th 818, 824 (5th Cir. 2024) (quoting *United States v. Barnes*, 979 F.3d 283, 295 (5th Cir. 2020)) (alteration in original).[1] The Government offered two possible objectives that violate the Anti-Kickback Statute ("AKS"): (1) violation of 42 U.S.C. § 1320a-7b(b)(1) and (2) violation of 42 U.S.C. § 1320a-7b(b)(2). Subsection (b)(1) prohibits "knowingly and willfully *solicit[ing] or receiv[ing]* any remuneration (including any kickback, bribe, or rebate) directly or indirectly . . . in return for referring an individual to a person for the furnishing . . . of any . . . service for which payment may be made in whole or in part under a Federal health care program." (emphasis added). Subsection (b)(2) prohibits "knowingly and willfully *offer[ring] or pay[ing]* any remuneration (including any kickback, bribe, or rebate) directly or indirectly . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any . . . service for which payment may be made in whole or in part under a Federal health care program." (emphasis added).

---

[1] While some defendants claim that they challenge all elements of the charged crime, no defendant meaningfully briefs whether the first element (the existence of the conspiracy) was proven. *See* Docket No. 1009 at 3–4 (Kraus); Docket No. 1049 at 15 (Madison); Docket No. 1062 at 7 (Theiler). Accordingly, the Court considers a challenge to the first element waived. *See United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) ("Where . . . a defendant asserts specific grounds for a specific element of a specific count for a Rule 29 motion [for acquittal], he waives all others for that specific count."). In any event, there was substantial evidence at trial of the existence of a conspiracy. *See, e.g.*, GX-12, GX-18 (Boston Heart contracts with Little River and Stamford, respectively); GX-287 (e-mail confirming that doctors were remunerated through MSOs); GX-289 (confirming that MSOs were merely conduits that did not provide management or administrative services); GX-286 (confirming that Boston Heart sales representatives worked with MSO representatives to induce doctors to order Boston Heart tests through the hospitals); Trial Tr. 4958–59, 5122 (O'Neal testifying that physicians would send both federal and private referrals in exchange for remuneration disguised as profits from investments shares in MSOs).

The degree of criminal intent required for a conspiracy charge is the same as the underlying substantive offense—here, "knowingly and willfully." *United States v. Njoku*, 737 F.3d 55, 63–64 (5th Cir. 2013) (discussing requisite mental state for conspiracy to violate the AKS).

The Court addresses each Defendant in turn.

### 1. Madison

Former CEO of Little River Jeffrey Madison raises three grounds for acquittal.

### a. Statute-of-Limitations Defense

Madison first argues that the last overt act in furtherance of the conspiracy occurred more than five years before the indictment was issued—and thus the indictment is barred by 18 U.S.C. § 3282(a). Docket No. 1049 at 5. Madison claims that the Government proved at most the existence of two separate conspiracies: one involving Boston Heart and Little River and another involving Boston Heart and Stamford Hospital. *Id.* at 7. And he contends that the last overt act involving the Boston Heart/Little River conspiracy occurred in December 2016—more than five years before the January 12, 2022 indictment. Alternatively, Madison argues that he withdrew from the conspiracy more than five years before the January 2022 indictment. *Id.* at 9. Both arguments fail.

**1.** The Court will not disturb the "jury's finding that the Government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the Government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *United States v. Shah*, 95 F.4th 328, 361 (5th Cir. 2024) (citing *United States v. Beacham*, 774 F.3d 267, 273

(5th Cir. 2014)); *see also United States v. Shows Urquidi*, 71 F.4th 357, 382 (5th Cir. 2023) (upholding jury finding of a single conspiracy because, *inter alia*, there was an "overlapping of participants" throughout a cartel's multi-regional operations). "The principal considerations in counting conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995). A single conspiracy can be found despite a lapse of time, change in membership, or a shifting emphasis in the locale of operations. *United States v. DeVarona*, 872 F.2d 114, 119 (5th Cir. 1989). "[A] common plan is not transformed into several plans on account of internal personnel changes." *United States v. Elam*, 678 F.2d 1234, 1247 (5th Cir. 1982). But an overlapping membership in various activities and interconnection between relationships may indicate a "single continuing plan or scheme." *United States v. DeLeon*, 641 F.2d 330, 334 (5th Cir. 1981); *see also United States v. Lindell*, 881 F.2d 1313, 1318 (5th Cir. 1989) (finding a single conspiracy where the evidence "reveal[ed] a substantial identity of facts or participants" where the conspiratorial objective was a large-scale narcotics transaction). Further, a "[s]ingle conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Shows Urquidi*, 71 F.4th at 382 (quoting *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987)).

Here, the Government offered overwhelming evidence of a single conspiracy—one unified by a "substantial identity of facts or participants." *See Lindell*, 881 F.2d

at 1318. For example, the Government offered evidence that many of the co-conspirators who negotiated the Little River arrangement also negotiated, approved, and managed the arrangement with Stamford. GX-349; GX-366; GX-393; GX-451; GX-464; GX-611; GX-615; GX-688; GX-840; *see also* Trial Tr. 4929–32. Defendants Laura Howard and Chris Gonzales recruited physicians to refer patients to both Little River and Stamford. GX-286, GX-291 at 3; GX-383, GX-594 at 3; GX-627. Boston Heart conducted testing for both Little River and Stamford. GX-12; GX-17; GX-18. And the MSO conspirators, including Robert O'Neal, Ruben Marioni, Scott Jacobs, and Dr. Jason DeMattia, worked with both hospitals. GX-289; GX-329 at 4; GX-476; GX-487; GX-611; GX-627; GX-652; GX-1032; *see also* Trial Tr. 983–84, 2136–37, 2295–96, 2839, 4850, 4915–16, 4945, 4957–58, 5135.

Additionally, Robert O'Neal testified that he and others began to work with Stamford before the termination of the relationship with Little River. Trial Tr. 4960. These conspirators were "key men" unifying different aspects of the conspiracy. *See Shows Urquidi*, 71 F.4th at 382. Madison argues that there must have been two conspiracies because Little River and Stamford were competitors. Docket No. 1049 at 7–8. But the Government presented evidence that any competition helped rather than hindered the conspiracy. *See* GX-470 (highlighting doctors moving between competing MSOs); GX-568 (Madison describing competition with other hospitals and wanting increased cooperation with Boston Heart); GX-837 (listing competing marketers that Little River utilized). And "[t]he fact that some participants in the scheme are in competition does not preclude a finding of a single conspiracy." *See*

9

*United States v. Morgan*, 117 F.3d 849, 859 (5th Cir. 1997) (citing *United States v. Wilson*, 116 F.3d 1066, 1076 (5th Cir. 1997), *vacated in part on other grounds*, *United States v. Brown*, 123 F.3d 213 (5th Cir. 1997)); *Wilson*, 116 F.3d at 1076 ("A single conspiracy may exist between two or more individuals . . . in competition with one another . . . who knowingly participate with the same core conspirators in pursuit of a common goal." (citing *Richerson*, 833 F.2d at 1154)).

The evidence, moreover, established a "common goal" among the conspirators. *See Shows Urquidi*, 71 F.4th at 382. The Government set out the common goal in the indictment: "to unlawfully enrich themselves by paying and receiving kickbacks in exchange for" patient referrals "for which payment was or might be made by a federal program." Docket No. 1 ¶ 3. And the evidence at trial, as stated above, bore out this common goal, which was advanced rather than defeated by the presence of multiple hospitals. *See Richerson*, 833 F.2d at 1153 ("Given these broad 'common goals' the common objective test may have become a mere matter of semantics."); *Shows Urquidi*, 71 F.4th at 381 (collecting cases and finding one conspiracy where codefendants collectively "carr[ied] out the Cartel's affairs through a pattern of racketeering activity"); *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir. 1994) (upholding jury finding of single conspiracy because the defendants had a "common goal of distributing illegal drugs for profit," even though not all defendants were aware of all codefendants). Viewing the evidence and all reasonable inferences in the light most favorable to the Government, the Court concludes that a reasonable juror could find a single conspiracy here. *See Shah*, 95 F.4th at 361.

The Government also presented more than enough evidence that an overt act occurred within the limitations period (on or after January 12, 2017). *See, e.g.*, GX-903; GX-906; GX-907; GX-909; GX-910; GX-911; GX-912; GX-918 (payments between conspirators); GX-299, GX-476; GX-482; GX-487; GX-635; GX-1060 (meetings, communications, and conduct about expansion of conspiracy to Stamford). *See Shah*, 95 F.4th at 361.[2]

**2.**    Alternatively, Madison argues that he withdrew from the conspiracy more than five years before he was indicted. Madison cites a letter sent by Little River to Robert O'Neal's MSO on December 22, 2016, in which "[Little River] terminated all its volume-based relationships with marketers." Docket No. 1049 at 9 (citing Trial Tr. 983–86, 1028–30, 5665–66; Madison Exs. 71 and 72; GX-92).

"A defendant is presumed to continue in a conspiracy unless he makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose." *United States v. Torres*, 114 F.3d 520, 525 (5th Cir. 1997). "'Establishing individual withdrawal [is] a burden that rest[s] firmly on the defendant regardless of when the purported withdrawal took place'—a burden perfectly consistent with due process because withdrawal is an affirmative defense, not an element of the charged offense." *United States v. Vargas,* 6 F.4th 616, 624 (5th

---

[2] Not only did the Government provide evidence of a single conspiracy, but it also proved that an overt act related to Little River occurred within the limitations period. Little River continued to communicate with Robert O'Neal in April 2017 regarding the continued payments from Little River to O'Neal's MSO. *See* GX-1060 at 3 ("Ascend is entitled to ongoing collections to and through July 21, 2017 under the Little River Contracts."). And because the conspiracy here included illegally paying physicians for referrals, facilitating payment of kickbacks to physicians by negotiating collections with the MSO is an overt act in furtherance of the conspiracy. *See United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir. 1984); *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d. Cir. 1982).

Cir. 2021) (quoting *Smith v. United States*, 568 U.S. 106, 110 (2013)). "'In order to show withdrawal, the defendant must show that he has committed affirmative acts inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators.'" *Id.* (quoting *United States v. Heard*, 709 F.3d 413, 428 (5th Cir. 2013)). And, because the jury determined this issue against Madison, the Court can overrule this part of the verdict and find withdrawal only if Madison "can show that [withdrawal] is the only reasonable view of the evidence." *Id.* (quoting *Hoffman*, 901 F.3d at 545).

Madison has failed to make this showing. The letter cited by Madison did not terminate Little River's agreements immediately, but on January 21, 2017—within the five-year limitations period. *See* Madison Exs. 71 and 72. While sending a termination letter may be some evidence of a withdrawal, a juror could also credit the delayed termination date as the date of withdrawal, which is what the Government argued to the jury. *See* Trial Tr. 6255–56; *see also Hoffman*, 901 F.3d at 544–45 (declining to disrupt the jury's rejection of withdrawal despite a dated termination letter); *see also Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 409982, at *6 (E.D. Pa. Feb. 5, 2021) (finding as a matter of law that the effective date of resignation, not the date of transmission of the resignation letter, served as the date of withdrawal from the charged conspiracy). Other evidence, moreover, cut against Madison's withdrawal theory. For example, Little River continued to communicate with Robert O'Neal in April 2017 regarding continued payments from Little River to O'Neal's MSO. *See* GX-1060 at 3 ("Ascend is entitled to ongoing collections to and

through July 21, 2017, under the Little River Contracts."). On these facts, a reasonable juror could find that Madison did not "disavow[] or defeat[]" the conspiracy's purpose. *See Hoffman*, 901 F.3d at 545 (quoting *Smith*, 568 U.S. at 133) (finding that "continuing to help [the conspiracy] along even if only from the sidelines" indicated a lack of withdrawal).

Madison's first argument fails.

### b. Advice-of-Counsel Defense

Madison next argues that he relied on the opinions of Ryan Downton, Little River's in-house counsel, and Adam Aseron, the hospital's outside counsel, regarding the legality of Little River's lab program and marketing arrangements. Docket No. 1049 at 13. Madison contends that this alleged reliance negates the intent element of the crime. *Id.*

"A successful advice-of-counsel defense negates willfulness by 'creat[ing] (or perpetuat[ing]) an honest misunderstanding of one's legal duties.'" *Shah*, 95 F.4th at 378 (quoting *United States v. Mathes*, 151 F.3d 251, 255 (5th Cir. 1988)). To meet the elements of an advice-of-counsel defense, a defendant must take the following steps:  "(1) before taking action, the defendant in good faith sought the advice of an attorney; (2) for the purpose of securing advice on the lawfulness of potential future conduct; (3) gave a full and accurate report of all material facts; and (4) the defendant acted strictly in accordance with the attorney's advice." *Id.* (citing *United States v. Bush*, 599 F.2d 72, 77 n.12 (5th Cir. 1979). In reviewing the record on this point, the Court must consider whether the evidence and all reasonable inferences, examined

in the light most favorable to the Government, could preclude reasonable jurors from finding that Madison had the requisite intent beyond a reasonable doubt.  *See id.* at 361; *see also Smith*, 568 U.S. at 113 ("The [Government] is foreclosed from shifting the burden of proof to the defendant only 'when an affirmative defense *does* negate an element of the crime.'" (quoting *Martin v. Ohio*, 480 U.S. 228, 237 (1987) (Powell, J., dissenting))).

Again, the evidence does not support Madison's argument.  The Government here presented substantial evidence of Madison's intent, including testimony from his co-conspirators that Madison knew they were unlawfully remunerating physicians to induce referrals for services that could be paid for by federal healthcare programs.  *See, e.g.*, Trial Tr. 789–90, 794 (Marioni describing the MSO model to Madison), 795–804 (describing Madison's knowledge of noncompliance of Marioni's MSO with the contract between the MSO and Little River), 851–57 (describing conversation between Marioni and Madison about payment of doctors), 881–82, 924–25, 4757–58 (O'Neal confirming that Madison was part of the conspiracy), 4866.

The evidence of Madison's reliance on counsel, moreover, was weak.  The Government showed that Madison failed to disclose to Aseron all the relevant facts— such as Dr. DeMattia's financial interest and affiliation with an MSO.  *See* GX-193A; GX-1058; GX-189; GX-743; *see also* Trial Tr. 4644.  Aseron also qualified his legal advice and testified that his advice was not frequently followed.  *See* Trial Tr. 4665, 4670, 4672–73, 4675, 4677–78, 4734–36; GX-743; GX-754; GX-758; GX-981; GX-750; *see Shah*, 95 F.4th at 378.  And Aseron agreed that his opinion of the Little

14

River MSO scheme would change if MSO revenue were generated by referrals to Little River.  *See* Trial Tr. 4680.  In fact, Aseron admitted he was unsure whether he received all the facts when analyzing whether the MSO model violated the AKS.  *See id*. 4678.   Indeed, Marioni and O'Neal characterized Aseron's legal advice and recommendation of attestations as "a paper exercise."  *See* Trial Tr. 924–925, 5018. Based on this evidence, a reasonable juror could conclude that Madison retained Aseron "to [e]nsure the success of [the conspirators'] mendacious scheme, not to secure legal advice."  *See United States v. Carr*, 740 F.2d 339, 347 (5th Cir. 1984).

Madison argues that the testimony of Marioni and O'Neal should not be credited.  Docket No. 1049 at 15–16.  And he cites Downton's testimony that he (Downton) believed that the marketing program was legally compliant.  *Id*. at 14. But "[i]t is well-settled that credibility determinations are the sole province of the jury."  *See United States v. Davis*, 61 F.3d 291, 297 (5th Cir. 1995).   The jury, moreover, was entitled to disregard the testimony of Downton, an interested attorney and alleged co-conspirator.  *See United States v. Novis*, 2023 WL 4746541, at *14 (E.D.N.Y. July 24, 2023) (finding that jury could reasonably reject the testimony of an interested co-conspirator lawyer in upholding verdict).

### c. Sufficiency of the Evidence

Finally, Madison argues that the Government failed to establish the elements of the crime charged against him. Docket No. 1049 at 15. But there was substantial evidence Madison voluntarily agreed to join the conspiracy—knowing it was unlawful—committed an illegal act to further the conspiracy. *See, e.g.*, *supra* Section III.A.1.b; GX-568; GX-180. Madison again complains that the two key witnesses against him (Marioni and O'Neal) were not credible, but their testimony was detailed, specific, and supported by documentary evidence. And in any event, the jury—not the Court—makes credibility determinations.

Madison also references an argument he made orally at trial—that the utilized MSO model was not illegal because the conspirators did not explicitly pay for referrals of federally insured patients. Docket No. 1049 at 4; Trial Tr. 5199–5200. But an agreement to remunerate physicians can be unlawful even if it is made in part, rather than solely or primarily, to induce a referral of a federally insured patient. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) ("[A]s long as 'the benefits extended to [the] defendant were, in part, an inducement for him to refer patients to the hospital . . . the Court must . . . find that the Agreement violates [the predecessor to 42 U.S.C. § 1320a-7b(b)(2)(A)].'" (quoting *Polk Cnty. v. Peters*, 800 F. Supp. 1451, 1456 (E.D. Tex. 1992))); *see also United States v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United*

*States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68, 69–72 (3rd Cir. 1985).

And here, the Government presented substantial evidence that the remuneration was made at least in part to induce the referrals of federally insured patients. Marioni, Dr. Salinas, and Gonzales testified, for example, that the kickback conspiracy involved paying physicians for both privately insured patients and federally insured patients. Trial Tr. 797–99, 838 (Marioni), 2164 (Salinas), 2293, 2356–57 (Gonzales). One witness explained that, although the payments were nominally to induce physicians to refer their privately insured patients for testing, the payments were in fact made to induce physicians to refer *all* their patients— including those for whom Medicare, Medicaid, or TRICARE would provide reimbursement. *Id.* 1117–18 (Marioni testifying that agreement was to motivate physicians to send all referrals). O'Neal and Marioni explained that physicians did not want to send samples from their federally insured patients to a different lab than their privately insured patients. *See id.* 1092–93, 4874–75. The Court highlighted this issue at trial: "if they are agreeing to pay for referrals from private patients and it necessarily includes Government patients, isn't that some evidence that there was an agreement to pay for federal patients?" *Id.* 5200.

Further, Marioni testified that the attestations signed by physicians, which stated that the payments were not intended to induce the referral of federally insured patients, were merely "a paper exercise" without significance. *See id.* 924–25; *see also id.* 5018 (O'Neal testimony) ("Q. So you're talking about a bigger MSO, Ascend

17

Professional Consulting, and then a sub-MSO for doctors?  A. MSOs are doctors, sir. It's just a tool, just like an attestation.  Same thing.  We all knew what we were doing.").  The Government also presented evidence that physicians who had never referred any patients, let alone federal patients, started referring all their patients (both federal and private) to Little River only after receiving payments through the MSOs.  *See* GX-180 at 3–4 (text messages between Hardaway and Madison about signing new physicians with MSO model).

In light of all this evidence, a reasonable juror could find that the remuneration was made at least in part to induce the referrals of federally insured patients.  *See Davis*, 132 F.3d at 1094.  Indeed, the Tenth Circuit recognized the difficulty in distinguishing whether a defendant (a) remunerated physicians for legitimate purposes while merely hoping or expecting that federal samples would be referred alongside commercial samples or (b) remunerated physicians at least in part for the referral of federal samples.  *McClatchey*, 217 F.3d at 835 n.7.  "Making such difficult factual determinations, however, is the very role which our system of justice assigns to the finder of fact."  *Id.* (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716–17 (1983)).

\*    \*    \*

Madison's challenge to the guilty verdict fails.  A reasonable juror could have rejected his defenses and found him guilty of conspiring to commit illegal remunerations in violation of 18 U.S.C. § 371.

18

### 2. Hertzberg

Former Boston Heart CEO Susan Hertzberg makes two arguments for acquittal.  Docket No. 1050.  First, she argues that the Government failed to prove she knew about or joined the kickback conspiracy.  Alternatively, she argues that she withdrew from the conspiracy outside the limitations period.  As explained below, these arguments are without merit.

#### a. Sufficiency of the Evidence

Hertzberg concedes that a kickback conspiracy existed—that Little River CEO Jeffrey Madison and Robert O'Neal conspired to "offer[] physicians the opportunity to invest [in MSOs] and receive 'distributions' based on the MSO's profits" and that "the distributions were actually shams intended to induce physician referrals." Docket No. 1050 at 3.  Hertzberg also concedes that members of her own sales team— Jeff Parnell, Gray Hardaway, and Laura Howard—joined the conspiracy, "secretly . . . work[ing] with the MSOs in exchange for a share of the payments from Little River."  *Id*. at 4.  And she acknowledges knowing that Little River utilized MSOs to "recruit doctors into the hospital's network" and that these physicians referred patients to Little River for Boston Heart testing.  *Id*. at 3–6.  Hertzberg nonetheless argues that no reasonable juror could have found beyond a reasonable doubt that she knew about the conspiracy and joined it.  *Id*. at 9–21.  The Court disagrees.

It is well-settled that the Government can prove criminal conspiracies "on circumstantial evidence alone."  *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020).  "Indeed, a jury can infer from the surrounding circumstances whether a

defendant participated in and knew of the conspiracy." *Id.* at 273–74 (citing *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015)). Because criminal conspirators operate in secrecy, a jury can consider "[w]hat people do" to infer "what lies in their mind." *Id.* at 274 (quoting *United States v. Ganji*, 880 F.3d 760, 768 (5th Cir. 2018)). "Indeed, the voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Hesson*, 746 F. App'x 324, 334 (5th Cir. 2018) (quoting *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014)); *see also Sanders*, 952 F.3d at 274 (holding that an agreement can "be inferred from concert of action.") (quoting *United States v. Frydenlund*, 990 F.2d 822, 825 (5th Cir. 1993). "Moreover, when an individual holds a position of authority within a company and remains within 'proximity to the fraudulent activities,' it is evidence that the defendant was aware of malfeasance within that company." *Hesson*, 746 F. App'x at 334 (quoting *Willett*, 751 F.3d at 340). "A similar inference is permissible when the individual fails to take remedial action in response to an employee's concerns about company practices." *Id.* (citing *Willett*, 751 F.3d at 342). "But the Government must still provide 'testimonial or documentary evidence' to support an inference of awareness." *Id.* (quoting *Ganji*, 880 F.3d at 777).

The evidence here is sufficient to infer that Hertzberg knew about and joined the conspiracy. In highlighting some of the evidence in the paragraphs that follow, the Court does not intend to exclude other evidence also supporting the verdict.[3]

---

[3] The same is true about the discussion herein regarding the other Defendants who challenged the sufficiency of the evidence. The Court adopts the Government's recitation of the record in its

First, Hertzberg was no hands-off CEO.  She was deeply involved in the day-to-day affairs of the sales representatives—especially with respect to the Little River relationship.  *See, e.g.*, GX-261; GX-276; GX-278 at 10; GX-332; GX-387 (e-mail from Hertzberg referring to MSOs recruiting physicians); GX-595 (Hertzberg's negotiation of hospital contracts for sales representatives); GX-180 at 6; GX-205; GX-325 (Shore's notes of call including Hertzberg discussing MSOs); GX-334; GX-426; GX-838; GX-839; GX-286 (Hertzberg's involvement as to relationships with hospitals); GX-954–970 (Hertzberg's receipt of updates regarding clients, volume, and revenue associated with Little River); Kraus Ex. 44 (note regarding involvement of senior management team in developing relationships with Little River and Integrity Health).  She was well aware that Little River used MSOs to recruit physicians, *see* Trial Tr. 3411; GX-427 at 4, and there was overwhelming evidence her subordinates knew that, to obtain referrals, Little River paid MSOs, which in turn allowed referring physicians to purchase ownership interests and disperse their profits to the physicians.  *See* GX-287.  Boston Heart Sales Representative Laura Howard testified, moreover, that Hertzberg was present on calls that discussed MSOs, the influence of MSOs, and Howard's collaboration with Robert O'Neal and his MSO.  *See* Trial Tr. 2724–25, 2758–59.  And the Government presented e-mails from Kraus to Hertzberg corroborating the relationship between Robert O'Neal and Howard, as well as contemporaneous e-mails and text messages written by Howard describing discussions with Hertzberg and other Boston Heart executives regarding competition

opposition to the motions, Docket Nos. 1129–33, and highlights certain key evidence herein for illustrative purposes.

in the MSO, laboratory, and hospital space. *See* GX-273; Trial Tr. 2846–49; GX-620 at 2–3; GX-194B at 120.

Hertzberg also took steps to conceal aspects of the conspiracy. *See, e.g.,* GX-220. The Government presented substantial evidence that the revenue from the Little River relationship was unusually high, Hertzberg was keenly aware of—and ecstatic about—the relationship's success, and Hertzberg and others were concerned about sharing this information "way too openly" within Boston Heart, "which is not good." *See* GX-489 at 7; GX-112 at 17; GX-271; GX-279; GX-386; GX-220. In one e-mail to Boston Heart Vice President of Payor Innovation and Strategy Jeff Craven, Hertzberg stated: "I don't want this [Little River volume and associated revenue] data shared. Period." GX-451; *see also* GX-537 (instructing general counsel not to share certain materials related to Little River with Boston Heart's parent company); Trial Tr. 5984. Hertzberg also abruptly ended Kraus's presentation to members of Boston Heart's leadership team about the relationship with Little River—a presentation that explicitly stated Little River used MSOs to recruit physicians to use its services. *See id.* 3411; GX-427 at 4. When Boston Heart sought to duplicate the Little River model with Stamford, moreover, Hertzberg knew that the agreement would require Boston Heart, not the hospital, to bill Medicare and Medicaid for patients referred by MSO-participating physicians. *See* GX-387; GX-392.

Further, when others warned Hertzberg about the possible illegality of the Little River arrangement, Hertzberg either took no action or attempted to silence them. For example, in November 2015, Boston Heart Vice President of Strategy

22

Joanna Shore warned Hertzberg and Theiler that she did not fully understand the Little River model using MSOs because critical access hospitals like Little River typically do not have marketing arms.  *See* GX-323.  Shore also advised that Boston Heart should "reel this in and ask the field to stand down on any further client bill engagement with hospitals."  *See id.*  And in June 2016, Boston Heart Hospital Sales Director Michael Ivers e-mailed Hertzberg about the "Compliancy Disaster" in Texas with the Little River relationship.  *See* GX-412.[4]  Ivers told Hertzberg that Shore:

> has personally informed me of individuals associated with [Little River] and [Integrity Hospital] who have in her view broken the law as it relates to critical access hospitals, physician referral, billing through both [Little River] and [Integrity] and much more with the association of the MSO's [sic] who are working on behalf of all parties.

*Id.*  Ivers explained that he heard physicians were being incentivized through MSO partnerships and that Little River and Integrity Health would "go up in smoke."  *Id.* Ivers later testified that the information about the use of MSOs in Texas was widely known within the company.  Trial Tr. 4497.

At trial, in discussing the e-mail to Hertzberg, Ivers testified that Hertzberg requested to meet with him personally, along with Boston Heart's Vice President of Human Resources.  *See id.* 4504.  According to Ivers, Hertzberg asked "why so many people were copied on the e-mail."  *Id.*  Ivers found her concern strange.  *Id.* 4586. Hertzberg told Ivers that she "felt like she had been punched in the gut by Mike

---

[4] The Court sustained Defendants' objection to this e-mail as hearsay and admitted the exhibit for its effect on the recipients.  At Defendants' request, the Court provided the jury with the following instruction:  "This exhibit was not admitted to prove the truth of any of the statements in the e-mail, but rather only to show notice of any of the recipients who received the e-mail."  Trial Tr. 4501; *see also id.* 6258.

Tyson, and she was still catching her breath." *Id.* 4504. Hertzberg also reassigned Ivers from hospital sales, an area where he was "confident" and "knowledgeable," to a different position in physician sales, which required him to report to a former lateral. *Id.* 4505, 4555–56, 4585–86. Ivers felt that he was "absolutely" pushed to the side. *Id.* 4581. Other than meeting with Ivers—and arguably demoting him—Hertzberg took no further action with his information. Hertzberg's inaction stands in stark contrast to her reaction several years earlier upon hearing about a competing laboratory engaging in similar activity—she reported the lab to the DOJ. *See id.* 4471–72; *see also id.* 4480 (requesting DOJ investigator Alan Atchison to investigate potential violations of the AKS). Hertzberg argues that she was in the process of leaving the company when Ivers sent his e-mail, alleviating her of any responsibility, but that is not the only inference one could draw. *See Moreno-Gonzalez*, 662 F.3d at 372.

A jury could infer from these circumstances that Hertzberg knew about and joined in the unlawful conspiracy. *See Sanders*, 952 F.3d at 273–74; *Hesson*, 746 F. App'x at 334. Evidence that a CEO is "an active leader in [the company's] operations," which put her "frequently in concert with co-conspirators," and that she routinely discussed aspects of the conspiracy with others was "ample evidence indicating her awareness of, authority over, proximity to, and complicity with a fraudulent scheme, which she perpetrated in concert with co-conspirators." *Hesson*, 746 F. App'x at 335; *see also Ganji*, 880 F.3d at 767 (co-conspirator and employee testimony regarding defendant's concerted actions rebutted innocent explanations of circumstantial

evidence).  Efforts to conceal an illegal conspiracy, moreover, can indicate that the person knew the conspiracy was illegal.  *See, e.g., United States v. Tooker*, 957 F.2d 1209, 1217 (5th Cir. 1992).  And being put on notice that a scheme could violate the AKS, combined with a person's experience in healthcare and engaging in "suspicious activities," could "allow[] the jury to infer [the person] was aware of unlawfulness." *Marchetti*, 96 F.4th at 828; *see also United States v. Murthil*, 679 F. App'x 343, 349 (5th Cir. 2017) (twenty years of healthcare experience was probative of knowledge of conspiracy to violate the AKS); *United States v. Abovyan*, 988 F.3d 1288, 1304 (11th Cir. 2021) (evidence of role, conduct, and consistent participation in the conspiracy and significant financial gains from the conspiracy was sufficient to support verdict defendant knew the unlawful purpose of the conspiracy).

Hertzberg argues that the other conspirators concealed the scheme and prevented her from knowing its unlawful purpose.  Docket No. 1050 at 10–11.  But many of Hertzberg's arguments simply take issue with the Government's interpretation and characterization of the evidence presented at trial.  *See, e.g.*, *id.* at 11–14.  That is not a proper basis for a judgment of acquittal because it asks the Court to step in and weigh the evidence.  *See Hernandez-Palacios*, 838 F.2d at 1348 (explaining that the court must "giv[e] the Government the benefit of all reasonable inferences and credibility choices"); *see also Moreno-Gonzalez*, 662 F.3d at 372 ("Our review of the sufficiency of the evidence is 'highly deferential to the verdict.'" (quoting *Harris*, 293 F.3d at 869)).  Further, although some evidence may have supported a

25

finding of concealment from Hertzberg, other evidence cut against it. As noted above, for example, Ivers—as well as former Boston Heart sales representative Jeff Parnell—testified that "everyone" in the company knew what was going on with the MSO kickback scheme. *See* Trial Tr. 1842–43, 1901 (Parnell), 4497–98 (Ivers).

As the Fifth Circuit recently cautioned, "[t]he jury's constitutional role in deciding criminal trials leaves little room for judicial second-guessing." *Crittenden*, 46 F.4th at 296.

For these reasons, Hertzberg's first argument for an acquittal fails. *See Sanders*, 952 F.3d at 273–74; *Hesson*, 746 F. App'x at 334–35; *Ganji*, 880 F.3d at 767; *Tooker*, 957 F.2d at 1217; *Marchetti*, 96 F.4th at 828.

### b. Withdrawal

Hertzberg alternatively argues that she withdrew from any conspiracy outside the statute-of-limitations period. Docket No. 1050 at 21.

As discussed above, a "defendant is presumed to continue in a conspiracy unless he makes a substantial affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose." *Torres*, 114 F.3d at 525. And here, Hertzberg did not make that showing. *See Vargas*, 6 F.4th at 624. Hertzberg points to her disassociation from Boston Heart in August 2016 and the unsigned agreement with Stamford Hospital as evidence of her alleged withdrawal. Docket No. 1050 at 21. But mere cessation of activity and disassociation are insufficient to establish withdrawal. *See Smith*, 568 U.S. at 114 ("[A] defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it.")

(emphasis in original). And, as the Government points out, there is no evidence that Hertzberg affirmatively refused to sign the Stamford agreement. *See* Docket No. 1130 at 17–18. The jury was also free to interpret the evidence of Hertzberg's continuing financial interest in the financial success of Boston Heart—and hence the conspiracy—as evidence that she did not withdraw from the conspiracy. *See* GX-77; GX-89; GX-1075.

*    *    *

Hertzberg's motion for acquittal is denied.

### 3. Theiler

Matt Theiler was the Vice President of Sales and Marketing at Boston Heart. Like Hertzberg, Theiler argues there was no evidence he knew of an unlawful kickback conspiracy or joined it. Docket No. 1062 at 7. But Theiler's argument fails for many of the same reasons as Hertzberg's—there was enough circumstantial evidence that a reasonable juror could infer Theiler knew of and "perpetrated [the conspiracy] in concert with co-conspirators." *See Hesson*, 746 F. App'x at 335; *see also Sanders*, 952 F.3d at 273–74.

For example, the evidence showed that Theiler was deeply involved with and knowledgeable about the Little River relationship, including that it used MSOs to recruit physicians to use Boston Heart tests. *See, e.g.*, GX-289; GX-278 at 10; Kraus Ex. 44 (highlighting the involvement of Boston Heart senior executives in the Little River relationship); GX-205; GX-325; GX-426; GX-286; GX-492; GX-978 at 7; GX-392 at 3; GX-366; Trial Tr. 2782–84 (coordinating and meeting with hospitals/MSOs and participating in sales meetings about Texas). Theiler was also told that the MSOs

did not in fact "provid[e] any management/administrative services for the office." GX-277A. And Laura Howard testified that she was aware MSOs were paying physicians to refer their patients to Little River for Boston Heart testing and that she and Theiler had "in-depth conversations about the MSOs and the influence that they provided." Trial Tr. 2723–25, 2759; *see also* GX-273; Trial Tr. 2849; GX-620; GX-194B at 120 (e-mails corroborating Howard's testimony about discussions with Theiler). Finally, Theiler attended a Boston Heart sales conference where the use of MSOs at Little River was discussed with lower-level sales staff, including with Jeff Parnell and David Kraus. Trial Tr. 1842. Parnell testified that "everyone" at the conference "seemed to know the model and what was going on"—"that physicians had the opportunity to invest in [MSOs]," which was driving the overwhelming sales success in Texas. *Id.* 1842–43, 1902 ("I can't imagine that he would not know how that worked."). Parnell also testified that he learned from another Boston Heart sales representative that physicians were signing false attestations from Little River stating that they did not have any financial investment in or participation with the MSOs—the act that formed the factual basis for his plea of guilty to misprision of a felony. *Id.* 1787–88.

Theiler also took steps to conceal the conspiracy. Parnell testified that Theiler told him and Kraus not to send him any e-mails about MSOs because Theiler did not want "a paper trail." *Id.* 1843. Theiler later repeated this instruction to Parnell individually. *Id.* 1853. In an e-mail to Hertzberg and Joanna Shore, moreover, Theiler warned that "information about this account [with Little River] is being

shared way too openly within our company . . . [and] [n]ow it seems it's also being shared outside our company, which is not good." GX-386. Robert O'Neal, the mastermind of the MSO-kickback scheme, testified that he and Theiler met in person in Dallas to discuss expanding the Little River model to other hospitals, and that Theiler told O'Neal privately they would need to concoct a "storyline" to explain the unusual success in Texas. Trial Tr. 4931. And like Hertzberg, Theiler knew that when Boston Heart sought to duplicate the Little River model with Stamford Hospital, the agreement would require Boston Heart, not the hospital, to bill Medicare and Medicaid for patients referred by MSO-participating physicians. GX-387; GX-392. In fact, Theiler was personally involved in the expansion of the conspiracy to Stamford, with the help of Robert O'Neal and his MSO. *See* GX-840.

And finally, like Hertzberg, Theiler received some warning that the MSO model utilized by Little River was potentially illegal. Joanna Shore advised Theiler (and Hertzberg) by e-mail to "reel this in" until she could better understand the situation. *See* GX-323. Shore also made clear to Theiler that O'Neal "wasn't someone [she] thought we should work with." Trial Tr. 4396. And Theiler received the Michael Ivers "Compliancy Disaster" e-mail and took no discernible action. *See* GX-412.

Viewing the evidence in the light most favorable to the Government, the Court finds that a rational juror could infer that Theiler knew about and participated in the unlawful conspiracy. *See Sanders*, 952 F.3d at 273–74; *Hesson*, 746 F. App'x at 334–35; *Ganji*, 880 F.3d at 767; *Tooker*, 957 F.2d at 1217; *Marchetti*, 96 F.4th at 828. Theiler's motion for acquittal is denied.

### 4. Kraus

There was also sufficient evidence to convict former Boston Heart Regional Sales Director David Kraus.

Kraus directly managed Parnell and Howard—the sales representatives who admitted knowing the unlawful purpose of the conspiracy and participating in it—as well as co-Defendant Gray Hardaway. *See* Trial Tr. 2721–26. Howard testified that Kraus would lead periodic sales calls with her and other Boston Heart sales representatives in Texas. *Id.* 2723. During these calls, MSOs in Texas were "a constant topic of conversation," Howard made no secret she was working alongside Robert O'Neal and his MSO, and they would "common[ly]" "discuss doctors' thought processes." *See id.* 2723–25, 2759, 2782–84, 2735; GX-366. Howard explained that "part of the MSO pitch" to physicians was that they would receive "financial compensation from the MSOs." Trial Tr. 2737. Howard also testified that Kraus was "aware of Robert O'Neal and aware of Robert O'Neal's ability to help Boston." *Id.* 2728. E-mails from Kraus to Hertzberg and Theiler referring to O'Neal as Howard's reliable source corroborate Howard's testimony. GX-273; Trial Tr. 2849.

Jeff Parnell also testified that he and Kraus discussed MSOs and that Kraus knew about the involvement of MSOs in the Texas market, including with Little River. Trial Tr. 1791, 1868. And like Theiler, Kraus attended the Boston Heart sales conference where "everyone" at the conference knew about the MSO model that was driving sales in Texas. *Id.* 1842. This MSO model included physicians investing in and being paid by MSOs. *Id.* 1842–43. Indeed, Kraus informed Theiler that MSOs working with Little River were not actually providing any management or

30

administrative services for the physicians' offices and they existed only to provide access to Boston Heart's testing.  GX-273; GX-277A; Trial Tr. 2849.

Kraus plainly demonstrated his own knowledge and understanding of the conspiracy in an executive summary he prepared for Boston Heart's parent company Eurofins.  GX-287.  Kraus sent a draft of the summary to Parnell and Hardaway, which included the following language:  "practitioners become investors by purchasing shares in the MSO.  *Little River will remunerate the Marketers/MSO, which in turn disperse their profits among the investors.*"  *Id*. at 3 (emphasis added).  In fact, physicians would receive more shares from the MSO if they referred more patients to Little River for Boston Heart tests.  Trial Tr. 4071.  O'Neal confirmed that physicians were remunerated through the MSO for their patient referrals, with the number of shares held by each physician directly related to the number of referrals.  *Id*. 4958–59, 5122.  Ruben Marioni also confirmed that the investments were not real but meant to compensate physicians based on referrals.  *Id*. 758–59.  Kraus later deleted the remuneration language from the executive summary before it was finalized.  *Id*. 1895–1901; GX-320.

Kraus also coordinated meetings with Texas hospitals and MSOs.  GX-286; GX-366; GX-389; Kraus Ex. 44.  Along with Howard, Kraus helped set Theiler's agenda for his Dallas trip to meet with potential referral sources and "marketers" employed by Little River.  Trial Tr. 2782–84; GX-366.  In an e-mail to Parnell and Hardaway, Kraus reported on a dinner meeting in which Little River's MSO model was discussed with physicians, some of whom were persuaded to refer patients for

Boston Heart testing after understanding the MSO model. GX-262. After the dinner, several physicians in fact joined an MSO and directed their referrals to Little River with the ultimate goal of subsequent referrals to Boston Heart for further testing. *Id.*

Based on this evidence, along with other evidence presented at trial, the Court finds that a rational juror could conclude that Kraus conspired to commit illegal remunerations in violation of 18 U.S.C. § 371. *See Sanders*, 952 F.3d at 273–74; *Hesson*, 746 F. App'x at 334–35; *Ganji*, 880 F.3d at 767; *Tooker*, 957 F.2d at 1217; *Marchetti*, 96 F.4th at 828. Kraus's motion for a judgment of acquittal is denied.

### 5. Hardaway

Former Boston Heart Sales Representative Gray Hardaway challenges the sufficiency of the evidence to convict him. Docket No. 1051 at 3, 21. Alternatively, Hardaway argues that he withdrew from the conspiracy outside the limitations period. *Id.* at 27. Both arguments fail.

#### a. Sufficiency of the Evidence

The Government presented legally sufficient evidence that Hardaway knew about and joined the unlawful conspiracy. Hardaway was on the ground in Texas and was deeply involved in building Boston Heart's relationship with Little River and the MSOs. Marioni testified that Hardaway knew about Marioni's MSO—including that it paid physicians for patient referrals. *See* Trial Tr. 861–62. Hardaway also frequently communicated with Madison about MSOs working with hospitals to send referrals to Boston Heart. *See, e.g.*, GX-568. And Hardaway received e-mails from Little River CFO Todd Cook (a co-conspirator who pleaded guilty in this case) coordinating an agreement between Little River, Boston Heart, and the MSOs. *See,*

*e.g.,* GX-469. Because of Hardaway's knowledge, others at Boston Heart asked Hardaway to explain the Little River relationship, including how it worked with Medicare. *See* GX-262.

Hardaway also received the Kraus summary discussed above, which explained that Little River remunerated physicians who referred their patients to the hospital for testing services. GX-287. Hardaway, moreover, received the e-mail from Parnell telling Kraus to delete the statements relating to remuneration. *See* GX-320. Hardaway also knew that the MSOs did not actually provide any management or administrative services for the physicians who joined them. GX-289; GX-277; GX-492; GX-978 at 7. And based on other evidence, the jury could infer that Hardaway provided that information to Kraus, along with information that the MSOs existed only to provide access to Boston Heart's testing and were recruiting doctors into the MSOs. GX-277; GX-277A; GX-289 at 4. And, finally, Hardaway often forwarded e-mails such as GX-830 and GX-568 to his personal e-mail account, which a reasonable juror could conclude was evidence of his knowledge and willfulness. *See Marchetti*, 96 F.4th at 828 (discussing compensation-related issues with personal e-mail addresses could support an inference of knowledge and willfulness).

In sum, in light of this evidence, as well as other evidence at trial, the Court finds that a rational juror could conclude that Hardaway knew about and participated in the unlawful conspiracy. *See Sanders*, 952 F.3d at 273–74; *Hesson*, 746 F. App'x at 334–35; *Ganji*, 880 F.3d at 767; *Tooker*, 957 F.2d at 1217; *Marchetti*, 96 F.4th at 828.

### b. Withdrawal

Hardaway alternatively argues that he withdrew from any conspiracy outside the statute of limitations period.  Docket No. 1051 at 27.

Hardaway failed to show withdrawal.  *See Vargas*, 6 F.4th at 624.  He claims that his resignation from Boston Heart in July 2016 is sufficient.  Docket No. 1051 at 28.  But mere cessation of activity and disassociation are not enough.  *See Smith*, 568 U.S. at 114 ("[A] defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it.") (emphasis in original).  In any event, Hardaway continued to associate with Boston Heart through his own MSO following his departure from the company.  Trial Tr. 2844;  *see also*  GX-193A,  Rows 2188, 3777–81  (text  messages  regarding Hardaway's continued activities in his own MSO).

*    *    *

Hardaway's challenge to the guilty verdict fails.  His motion for acquittal is denied.

## B. Motions for New Trial

Defendants also move for a new trial.  As explained below, Defendants' arguments are without merit.

### 1. Juror Communications

Several Defendants complain about the Court's communications with the jury. But they misunderstand—or misrepresent—the material facts.  There was no error, and any error would have been harmless.

34

### a. Factual Overview

The case was submitted to the jury on Tuesday, November 28, at 9:49 a.m. Following its typical practice, the Court provided the jury with blank Jury Note forms, numbered in sequential order, to ensure that any communications between the jury and the Court were properly documented.

**Juror Note 1.** Shortly after deliberations began, as instructed by the Court, the jury sent its first note identifying the foreperson. Trial Tr. 6259. The Court did not respond to this note.

**Juror Note 2.** Later that same day, at 2:26 p.m., the jury sent Note 2 stating that "Juror #1 would like to talk with Judge Kernodle Wednesday morning." Docket No. 1019 at 1. The following morning, Wednesday, November 29, the Court made itself available in the courtroom with the court reporter present to hear from Juror No. 1. The Court Security Officer then relayed to the Court that Juror No. 1 no longer needed to speak to the Judge. The Court therefore did not speak with any juror or send any other communication to the jury regarding Juror Note 2.

**Juror Note 3.** At 10:55 a.m. on Wednesday, November 29, the jury sent Note 3 stating that "Juror # 12 is unwilling to change his mind based on the evidence provided and the instructions you provided." Docket No. 1019 at 2. The Court assembled the parties in the courtroom to prepare a response to Note 3. The Court read the note aloud and then proposed the following response: "I refer you to the instructions already provided. I further instruct you to continue deliberating until you have reached a unanimous decision. You may be as leisurely in your

deliberations as the occasion may require, and you should take all the time which you feel is necessary."  Trial Tr. 6265; *see also* Docket No. 1019 at 3.  All parties agreed to this response.

**Juror Note 4.**  Before the Court responded to Note 3, the jury sent a fourth note that repeated the message of Note 3.  This note stated:  "Juror #12 informed the jurors that his 'moral compass' would not allow him to be open minded.  He also stated he would 'hang this jury.'"  Docket No. 1019 at 4.  Because the fourth note was "very similar to the first note regarding Juror No. 12" and the Court was in the process of responding to Note 3, the Court "did not respond to [Note 4]."  Trial Tr. 6271.

**Verdict.**  The jury continued deliberating the remainder of the day on November 29 and the morning of Thursday, November 30.  At 11:00 a.m. on Thursday, the jury informed the Court that it had reached a unanimous verdict.  Docket No. 1029 at 5.  The Court convened the parties, at which point the Court informed them of the fourth note.  Trial Tr. 6271.  Neither side objected at that time.  *Id.* The Court then brought in the jury, which delivered the unanimous guilty verdicts.  Thereafter, the Court polled each juror individually, with each person confirming the guilty verdicts.  *Id.* 6272–73.

### b.  First and Second Notes

Some Defendants complain that the Court did not immediately inform them about the first and second jury notes or allow them to propose responses.  Kraus and his counsel also claim that the Court had "unrecorded communications with the jury,"

despite the Court's repeated statements that no communication occurred. Docket No. 1064 at 17.

Rule 43 entitles a defendant to "be present at . . . every trial stage, including jury impanelment and the return of the verdict." FED. R. CRIM. P. 43(a)(2). The Fifth Circuit has interpreted this Rule to require that when a court receives communications from the jury, "counsel [for a defendant] should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given." *United States v. Bieganowski*, 313 F.3d 264, 293 (5th Cir. 2002) (quoting *United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir. 1976)). But there is no right to be informed of a jury note that requires no response, as here. In fact, it is the routine practice of the judges of this Court not to immediately inform the parties about a note identifying the foreperson, which is nearly always the first jury note received, and never to "respond" to it. In any event, the Court informed the parties about the first note. Trial Tr. 6265. And the Court would have informed the parties about the second note if the juror had actually spoken with the Court.

As for Kraus's claim about imagined, unrecorded conversations with the jury, it is categorically false. Following the trial, Kraus's counsel inquired about such communications, and the Courtroom Deputy responded on behalf of the Court to all counsel by e-mail plainly and clearly: "The Court had no interaction with the jury or any individual jurors during deliberations outside of the notes provided." (Notably, Kraus's counsel did not include the Courtroom Deputy's e-mail when attaching other related e-mails to his motion. *See* Docket No. 1064, Ex. 1.) Despite the Court's

37

representation, Kraus's counsel submitted affidavits testifying that a Courtroom Security Officer had locked the courtroom doors and told them the Judge was speaking with the jurors *ex parte*. *Id.*, Exs. 2, 3. This is false. Contrary to counsel's claims, there were no "unrecorded and *ex parte* communications with the jury during its deliberations," no "locking the courtroom doors," and no "oral instruction to the jury once deliberations began." *See* Docket No. 1064 at 6. Kraus's continued pressing of this imaginary scenario is both unfounded and bizarre.

### c. Third and Fourth Notes

Defendants also argue that the Court erred by not immediately notifying them about Note 4 or responding to it.

But defendants do not have an absolute right to be immediately notified of every juror note or to propose a response. Rather, a defendant has a right to be heard before a court gives a supplemental charge, which did not happen here. *See Bieganowski*, 313 F.3d at 293; *United States v. Bascaro*, 742 F.2d 1335, 1355 (11th Cir. 1984); *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1981). "Whether or not to use a written charge and whether or not to reply to a jury's request for additional instructions are both matters properly determined by the sound discretion of the trial judge." *United States v. Acosta*, 763 F.2d 671, 677 (5th Cir. 1985). Because the trial judge is in the best position to evaluate the jury, the "trial judge [has the] flexibility, within broadly defined parameters, to handle such situations in the least disruptive manner possible." *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995). Here, Note 4 did not ask any questions or express confusion, but merely

restated Note 3.  The Court concluded that separately responding to the fourth note could potentially confuse and disrupt the jury.  *See Acosta*, 763 F.2d at 677.  Any response, moreover, would have repeated the response to Note 3.  And the Court informed the parties about the note the next time they assembled in the courtroom. *See* Trial Tr. 6271.

*United States v. Mejia* is distinguishable.  356 F.3d 470 (2d Cir. 2004).  In that case, the jury had been deadlocked for several days, and the court responded to a jury note identifying a single holdout "without consulting the parties" by sending the jury a copy of its instructions with highlighted sentences.  *Id.* at 473.  Less than an hour later, the jury returned a guilty verdict.  *Id.*  The Second Circuit held that under these circumstances the court's *ex parte* communication with the jury "may have induced unanimity."  *Id.* at 476 (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). Here, in contrast, the jury had been deliberating only a few hours when it sent Note 4. And, with the consent of counsel, the Court had just responded to the very-similar Note 3 by referring them "to the instructions already provided" and directing them to "continue deliberating."  Docket No. 1019 at 3.  There was no indication the jury was deadlocked.  *See, e.g., United States v. Glover*, 681 F.3d 411, 423 (D.C. Cir. 2012) (A district court has "considerable discretion in determining how to respond, if at all, to a jury's request for clarification of a jury instruction.").  Further, unlike in *Mejia*, the Court did not communicate *ex parte* with the jury regarding Note 4.

Hertzberg argues that the response to Note 3 became a coercive *Allen* charge response to Note 4.  An *Allen* charge is a set of "supplemental instructions urging

jurors to forego their differences and reach a unanimous verdict." *United States v. Heath*, 970 F.2d 1397, 1406 n.2 (5th Cir. 1992). The response to Note 3 was no *Allen* charge. Because the note came so soon after the jury began deliberations (following a multi-week trial with five defendants), the Court's response merely reminded them of the Court's prior instructions—to deliberate in good faith and not to "give up your honest beliefs . . . because of the opinion of your fellow jurors." Docket No. 1017 at 24. The jury here, moreover, continued to deliberate for an additional seven hours, returning the verdict the following morning—twenty-four hours after receiving the Court's response to Note 3. This length of delay between the Court's response and the verdict demonstrates a lack of coercion. *See, e.g., United States v. Andaverde-Tinoco*, 741 F.3d 509, 517–18 (5th Cir. 2013) (evaluating Fifth Circuit cases holding shorter periods between charge and verdict as not being coercive). Indeed, following the verdict, the Court polled each juror, who stood and affirmed the verdict in open court, further indicating a lack of coercion, Trial Tr. 6272–73; *see United States v. Barragan-Devis*, 133 F.3d 1287, 1289–90 (9th Cir. 1998).

Finally, any error in not immediately disclosing Note 4 would have been harmless. *See United States v. Sylvester*, 143 F.3d 923, 928 (5th Cir. 1998). Defendants claim they would have moved for a mistrial or requested an *Allen* charge. But Note 4 was remarkably similar to and closely followed Note 3, and no one moved for a mistrial or requested an *Allen* charge in responding to Note 3. In any event, the Court would have denied the requests. "District courts have broad discretion to give *Allen* charges when the jury indicates deadlock." *United States v. Hitt*, 473

F.3d 146, 153 (5th Cir. 2006) (citing *United States v. Rivas*, 99 F.3d 170, 175 (5th Cir. 1996)). And here, the jury had been deliberating for less than a day following a long, complex trial with multiple defendants. It would have been inappropriate to issue an *Allen* charge, or any other response, at that early point in the deliberative process. *See United States v. Bayer*, 331 U.S. 532, 536 (1947) ("The trial judge in the light of the whole trial and with the jury before him may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse."). Any *Allen* charge, moreover, would not have changed the outcome given the early stage of deliberations and the length of time between Note 4 and the verdict. *See Andaverde-Tinoco*, 741 F.3d at 517.

Defendants' motion for a new trial on this ground is denied.

### 2. Discovery Issues

Several Defendants argue that the Government committed *Brady* and *Giglio* violations by delaying transmission of or withholding certain exculpatory or impeachment material.

Some Defendants argue that the Government violated *Brady* by failing to disclose before trial tens of thousands of documents (e-mails and attachments) obtained by a 2019 search of Robert O'Neal's e-mail account. Docket No. 1050 at 37. Hertzberg claims her counsel learned of the warrant for the first time during the cross-examination of Agent Geren on November 7, 2023. The next morning, the Government acknowledged the "oversight" and produced a thumb drive containing the e-mails, but the vast majority were apparently "not readable," according to Hertzberg. *Id*. Hertzberg resolved the technical issues a week later, but given the

41

obligations of trial, could not perform a thorough review until after the verdict. Docket No. 1052, Declaration of Keisha N. Stanford ¶¶ 12, 16.

*Brady v. Maryland* prohibits the Government "from suppressing evidence favorable to the defendant 'where the evidence is material either to guilt or to punishment.'" *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To demonstrate a *Brady* violation, "a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018) (quoting *Dvorin*, 817 F.3d at 450). "[E]vidence that is turned over to the defense during trial . . . has never been considered suppressed." *Id.* (emphasis in original) (citing *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008)). Moreover, courts have held that a defendant is not prejudiced by the late disclosure of evidence if the evidence is received in time for its effective use at trial. *Powell*, 536 F.3d at 335 (citing *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)); *see also United States v. Chesser*, 795 F. App'x 242, 244–45 (5th Cir. 2019) (disclosure of report containing allegedly exculpatory information after the Government rested its case-in-chief but before defendant's case was not a *Brady* violation because defendant was able to use evidence in her case and in closing argument).

Here, by Defendants' own admission, the Government disclosed the O'Neal e-mails during trial. *See* Docket No. 1052, Declaration of Keisha N. Stanford ¶ 12.

And the disclosure came almost a week before O'Neal testified.  Defendants could have and did use the e-mails during cross-examination of Government witnesses.  *See* GX-421; GX-609; GX-688; Trial Tr. 4396–97.  In any event, Hertzberg has not identified any e-mail that was material—that could have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  "Mere speculation that a trial might have gone differently is insufficient to show the requisite prejudice from a tardy disclosure." *Swenson*, 894 F.3d at 683.

Defendants cannot reasonably claim prejudice even if the e-mails were suppressed and material.  *See Powell*, 536 F.3d at 335 ("In this Circuit, when the claim is untimely disclosure of *Brady* material, we have looked 'to whether [the defendant] was prejudiced by the tardy disclosure.'" (citing *United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998))).  As the Government points out, Hertzberg's legal team consisted of several attorneys and staff who had ample time to access and review the materials before O'Neal's testimony.  *See* Docket No. 1130 at 41.  Moreover, Defendants wasted days of trial time by their routine failure to have witnesses ready and their decisions to cancel prospective witnesses as noted in the Court's Order to Show Cause.  *See* Docket No. 967.  Defendants initially requested ninety-three hours combined for their case-in-chief but used only approximately ten hours.  *See id.*  Defendants' failure to use their time and resources effectively to review the O'Neal e-mails does not warrant a new trial.  *See Williams*, 132 F.3d at 1060–61 (finding waiver of prejudice when the defendant rejected the court's offer of a

continuance to "review [his] strategy and examine additional witnesses in connection with the newly disclosed evidence").

A few Defendants re-raise other discovery arguments made and rejected by the Court at trial.  In doing so, they cite no new authority or facts that would change the Court's decision.  Accordingly, the Court stands by its earlier rulings on these matters.

The motion for new trial on this ground is denied.

### 3. Rule 801(d)(2)(E) Co-conspirator Statements and Findings

Defendants challenge the admission of certain hearsay statements pursuant to Federal Rule of Evidence 801(d)(2)(E), arguing that the Government did not prove the existence of a conspiracy and that the Court should have made a detailed factual finding when admitting the statements.

The Government, through witness testimony and exhibits, offered co-conspirator statements pursuant to Rule 801(d)(2)(E), which provides that a statement is not hearsay if it is "offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy."  For a statement to be admissible under this provision, "'[t]he proponent of admittance . . . must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy.'" *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011) (quoting *United States v. Solis*, 299 F.3d 420, 443 (5th Cir. 2002)); *see also United States v. Fragoso*, 978 F.2d 896, 899 (5th Cir. 1992) (quoting *Bourjaily v.*

*United States*, 483 U.S. 171, 175 (1987)). "The content of the statement may be considered as part of the analysis, but there must also be independent evidence establishing the factual predicates for Rule 801(d)(2)(E)." *El-Mezain*, 664 F.3d at 502.

Throughout the trial, the Court evaluated numerous statements and conditionally admitted certain ones subject to the Government's proof of the required predicate facts. The Court also analyzed challenged statements before trial began each day—and during trial—as well as sustained the objections to certain statements as falling outside Rule 801(d)(2)(E). *See, e.g.,* Trial Tr. 650–51, 1505–12. Following the close of the Government's case-in-chief, the Court reviewed the evidence and ruled on the conditional admission of the Rule 801(d)(2)(E) statements:

> I will note for the record that I conditionally admitted several exhibits with out-of-court statements under Rule of Evidence 801(d)(2)(E), and I carried the Defendants' motion challenging the admission of those statements. After considering the record, the Court finds that the Government has shown by a preponderance of the evidence that the requirements of Rule 801(d)(2)(E) are met here, and I, therefore, finally admit the exhibits under that provision.

Trial Tr. 5209. No Defendant objected that this finding was insufficient or asked the Court to issue further findings. *Id.*

Some Defendants complain about the Court's procedure of conditionally admitting certain statements under Rule 801(d)(2)(E). But that's a permissible—and common—practice. *See, e.g., Fragoso*, 978 F.2d at 900 (noting that it is "sometimes not reasonably practicable 'to require the showing to be made before admitting the evidence'" and thus a district court may "carry[] a *James* motion through trial"). And the Court's chosen procedure of admitting the statements without detailed factual findings comports with Fifth Circuit precedent. *See United States v. Osgood*, 794

F.2d 1087, 1093 (5th Cir. 1986) (finding no error when the trial court admitted co-conspirator statements without delineating findings and when the defendants did not object at trial).

Several Defendants seem to object that statements by unindicted co-conspirators fell within the Rule. But an individual may be considered a co-conspirator even if "he only participated at one level" or "only played a minor role in the conspiracy." *United States v. Posada-Rios*, 158 F.3d 832, 858 (5th Cir. 1998). Further, "[a]lthough the rule speaks of statements made in furtherance of a 'conspiracy,'" the Fifth Circuit "[has] recognized that admissibility under Rule 801(d)(2)(E) does not turn on the criminal nature of the endeavor." *El-Mezain*, 664 F.3d at 502 (citing cases). "Instead, a statement may be admissible under Rule 801(d)(2)(E) if it is made in furtherance of a lawful joint undertaking." *Id.* "'One can qualify as a 'joint venturer' for the purposes of Rule 801(d)(2)(E) merely by engaging in a joint plan—distinct from the criminal conspiracy charged—that was non-criminal in nature.'" *Id.* (quoting *United States v. Holy Land Found. for Relief & Dev.*, 624 F.3d 685, 694 (5th Cir. 2010)). In admitting statements by unindicted co-conspirators, the Court ensured that the statements were made during the course and in furtherance of a common plan or endeavor with a Defendant. *Id.*; *see also United States v. Postal*, 589 F.2d 862, 886 (5th Cir. 1979) (holding that a ship's logbook was admissible under Rule 801(d)(2)(E) as a co-conspirator statement in a drug conspiracy case because the ship's crew were engaged in the voyage of the ship, which was a "'joint venture' in and of itself").

Other Defendants object to the number of statements admitted under Rule 801(d)(2)(E).    But this was an extensive, multi-year conspiracy involving numerous individuals at several companies.    And the Court did not simply admit all such statements requested by the Government, but carefully considered each one individually and examined the evidence before finally admitting certain statements under the Rule.    On many occasions, the Court sustained the defense objection and ruled that the statement was inadmissible hearsay.

The Court stands by these decisions.

### 4. Admission of Certain Evidence

Defendants argue that the Court improperly admitted certain evidence that prejudiced their substantial rights and warrant a new trial.    The Court disagrees.

### a. GX-1059

On the eighteenth day of trial, November 20, 2023, the Government moved to admit GX-1059 during the cross-examination of Ryan Downton, a defense witness called by Jeffrey Madison.    Trial Tr. 5776, 5782.    The exhibit is a May 18, 2017 e-mail from a Little River executive, copying Downton and Madison.    GX-1059 included the following passage at issue:

> Lab here is like cocaine.    The first time you use it is great.    Makes you feel above the world and powerful.    Before addiction occurs, every time you do it your [sic] on top of the world.    Once addiction occurs you have to have it or you will go through withdrawals.    You don't try to turn to other things because this drug is what you want and know.    Then your (sic) so addicted, you need it to survive.    You have been caught and threatened by police that if caught again your (sic) going to jail.    They suggest you get help and look for sources to replace this drug.    You see no way out and continue to a point where it leads to your death.    Just substitute labs for cocaine . . .

Defendants objected to the e-mail for multiple reasons, including hearsay and undue prejudice under Rule 403. Trial Tr. 5776–84. The Court overruled the objections and admitted the e-mail not for the truth of the matter asserted but to demonstrate Downton's notice of concerns raised about the lab program by another Little River owner. *Id.* 5779.

Defendants Kraus and Hardaway now re-raise their Rule 403 objection to GX-1059. They claim that the exhibit "offered minimal, if any probative value" and "was merely meant to inflame the jury." Docket No. 1064 at 30. The Court is unpersuaded. The exhibit was admitted for the limited purpose of showing Downton's state of mind following his testimony regarding the legitimacy of Little River's lab program—i.e., that others had raised concerns with Downton about the program. *See* Trial Tr. 5790. And the Court expressly instructed the jury to consider the exhibit for this limited purpose only. *See id.* Given the circumstances, the Court concluded that the relevance of the exhibit substantially outweighed any potential prejudicial effect arising from the colorful language used by the sender. *See United States v. Sims*, 11 F.4th 315, 323 (5th Cir. 2021) ("Rule 403's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (quoting *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008))). The Court stands by its decision and further finds that any error in admitting this exhibit, one of nearly 500 exhibits admitted at trial, would have been harmless in light of the substantial evidence against Defendants. See *El-Mezain*, 664 F.3d at 526. ("Under this standard, we ask 'whether

the error itself had substantial influence' on the jury in light of all that happened at trial; if we are 'left in grave doubt, the conviction cannot stand.'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946))).

### b. GX-412

Government Exhibit 412 is the June 3, 2016 e-mail about the "Compliance Disaster" in Texas from Boston Heart employee Mike Ivers to Susan Hertzberg, Matt Theiler, and others, which is discussed above. The Government did not seek to admit the exhibit for the truth of the matter asserted, but to show notice to and effect on the recipients. Trial Tr. 6223–24; *see also* FED. R. EVID. 801(c); *United States v. Ballis*, 28 F.3d 1399, 1405 (5th Cir. 1994) (finding statements admitted "to show the effect of those statements" is not hearsay). The Court admitted the e-mail for this limited purpose and gave the following limiting instruction to the jury on three separate occasions: "This exhibit was not admitted to prove the truth of any of the statements in the e-mail, but rather only to show notice [to] any of the recipients who received the e-mail." Trial Tr. 4501; 6258; Docket No. 1017 at 13–14. Ivers, moreover, testified about the e-mail and was subject to cross-examination regarding the e-mail and his direct testimony. Trial Tr. 4490–4594.

Defendant Theiler complains that the testimony about the e-mail "far exceeded the limited purpose of whether Theiler and others received notice of Ivers' concerns." Docket No. 1062 at 32. But much of the complained-about testimony was Ivers reviewing the e-mail and explaining to the jury why he sent it. Trial Tr. 4490–4501. Theiler also contends that the Government invited the jury to consider the e-mail for

49

its truth during the Government's closing argument.  The Court disagrees, but in any event gave the jury the limiting instruction Theiler requested at the time, telling them after closings that "certain exhibits were admitted not to prove the truth of what is in the exhibit but for the effect on the listener or the receiver . . . Exhibit 412 is one such exhibit." *See id.* 6258.  And jurors are presumed to follow instructions.  *See, e.g., United States v. Mejia*, 792 F. App'x 318, 319 (5th Cir. 2020)  Finally, any error regarding GX-412—again, one of nearly 500 exhibits admitted at trial—was harmless in light of the substantial other evidence against Theiler and the other Defendants.  *See, e.g., El-Mezain*, 664 F.3d at 526.

### c.  Geren's Testimony

In testifying about his investigation, Agent Jack Geren was asked "whether or not a person is an experienced healthcare professional . . . affect[s] your evaluation as an agent."  Trial Tr. 3565.  He said yes and explained that "in this particular case, with respect to allegations of illegal kickbacks, the fact that an individual has years of experience in the healthcare arena suggests to me that these individuals should know what an unlawful arrangement is."  *Id.*

Hertzberg and Theiler argue this was improper opinion evidence under Rule 701(b) and an improper legal conclusion under Rule 704(a).  The Court did not— and does not now upon further review—interpret Geren's testimony to violate the Rules.  Rather, Geren was explaining generically why a person's experience in healthcare matters in a kickback conspiracy case, which the Fifth Circuit has repeatedly held is valid circumstantial evidence of willfulness under the AKS.  *See,*

*e.g., Marchetti*, 96 F.4th at 828. The Court in fact instructed the Government to "stay away from any questions [of Geren] about intent," instructing that the Government could ask only "the generic question about what would people in the [healthcare] field understand." Trial Tr. 3724–25. And Geren's testimony complied with that instruction. Geren never opined that any specific Defendant in this case had the requisite scienter. *See United States v. Anderskow*, 88 F.3d 245, 249 (3d Cir. 1996) (finding no plain error when "[t]he witness never explicitly opined on direct examination that [the defendant] possessed guilty knowledge."). Any error, moreover, was harmless in light of the substantial other evidence against Hertzberg, Theiler, and the other Defendants. *See, e.g., El-Mezain*, 664 F.3d at 526.

### 5. Closing Arguments

Several Defendants argue that the Government made improper statements during its closing argument.

Prosecutors are "confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). Allegations of prosecutorial misconduct are reviewed under a two-step analysis: (1) was a remark improper; and (2) did it affect the defendant's substantial rights. *Shah*, 95 F.4th at 379. "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* (quoting *United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011)) (considering the threshold for improper closing argument a "high bar").

Defendants largely complain about the Government's interpretation of the evidence. The Court has reviewed the statements carefully and finds that the Government was for the most part drawing reasonable inferences and conclusions from the evidence. For example, Hertzberg and Theiler point to the Government's statements that Hertzberg directed Theiler to work with O'Neal and that Shore warned Theiler and Hertzberg to cease illegal activity. *See* Docket No. 1050 at 29, 31; Docket No. 1062 at 26–27. These are reasonable interpretations of the evidence. To be sure, Defendants were entitled to argue to the jury about competing inferences and conclusions, which they did. And the Government acknowledged that it misstated a fact in closing. But viewed in context, the Government's statements about the evidence were not mischaracterizations that rise to prosecutorial misconduct. *See, e.g.*, *United States v. Lara*, 23 F.4th 459, 481–82 (5th Cir. 2022) (finding no misconduct when the prosecutor argued reasonable inferences and conclusions to the jury and responded to theories of the evidence offered by defense counsel). Also, the Court instructed the jury that the "arguments made by the lawyers are not evidence," that the lawyers will "point out those things that are most significant or most helpful to their side of the case" and may "call your attention to certain facts or inferences that might otherwise escape your notice," but that "[i]n the final analysis," it is "your own recollection and interpretation of the evidence that controls the case." Docket No. 1017 at 3.

Even if the Government's argument fell on the wrong side of the line in certain instances, moreover, Defendants "have not carried their burden of showing

substantial prejudice." *Shah*, 95 F.4th at 381.  As in *Shah*, the evidence against these Defendants was substantial, and in light of the numerous limiting instructions given to the jury throughout the trial, Defendants have not shown that, "taken together, the 'remarks cast serious doubt on the correctness of the jury's verdict.'"  *Id.* (quoting *Aguilar*, 645 F.3d at 325).  *See also, e.g.*, *United States v. Rodonaia*, 2022 WL 4364735, at *1 (5th Cir. Sept. 21, 2022) ("[Defendant] fails to show that it resulted in prejudice to his substantial rights, as other evidence supported an inference of a connection, the jury was cautioned not to treat the lawyers' arguments as evidence, and the strength of the evidence supporting the convictions was otherwise strong.").

Theiler also complains about the Court telling the lawyers during closings that "[t]here will be no more speaking objections."  Docket No. 1062 at 27–28 (citing Trial Tr. 6255).  The Court's instruction followed two instances of counsel objecting to the Government's closing and making improper argument in the presence of the jury.  *See* Trial Tr. 6254–55.  The Court stands by that instruction; it certainly does not entitle Theiler to a new trial.

### 6. Variance from the Indictment

Theiler argues that "the evidence at trial created a prejudicial variance" because the Government "fail[ed] to prove any of the specific factual allegations in the indictment as to Theiler."  Docket No. 1062 at 3.

"A variance occurs 'when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense.'"  *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (quoting *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005)).

To determine whether a variance occurred, the Court must "compar[e] the evidence presented at trial with the language of the indictment." *Id.* (citing *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)). "If a variance did occur, [the Court] reverse[s] only if the variance prejudiced the defendant's substantial rights" by "failing to sufficiently notify him so that he can prepare his defense and [] not be surprised at trial." *Id.* at 316 (citing *Delgado*, 401 F.3d at 295). "In determining whether a variance resulted in prejudice, [the Court] employ[s] a harmless-error analysis." *Id.* (citing *United States v. Ramirez*, 145 F.3d 345, 351 (5th Cir. 1998)). "[T]he Government need not prove all facts charged in the indictment as long as it proves other facts charged in the indictment which do satisfy the essential elements of the crime." *United States v. England*, 480 F.2d 1266, 1269 (5th Cir. 1973) (citing *United States v. Trexler*, 474 F.2d 369 (5th Cir. 1973)).

Theiler's argument fails because the Government proved facts charged in the indictment that satisfy the essential elements of the crime. The Government provided substantial evidence of a conspiracy to illegally remunerate physicians through MSOs in exchange for referrals to rural Texas hospitals for Boston Heart laboratory tests, some of which were later reimbursed by federal payors, and that Theiler knew the unlawful purpose of the conspiracy and willfully joined it. *See supra* Section III.A.3. Theiler cites statements in the indictment that he claims were either not proven by the Government, proven to be false, or proven to be legal. *See, e.g.*, Docket No. 1062 at 3 (citing Docket No. 1 ¶¶ 43, 55, 57, 70–71). But these statements are either immaterial or are the Government's characterizations of facts proven at

trial. Neither justifies a new trial. *See United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992) ("[W]hen an indictment alleges non-essential facts, the government need not prove them in order to sustain a conviction.").

Nor has Theiler shown how any variance affected his substantial rights. *See United States v. Meza*, 701 F.3d 411, 424–25 (5th Cir. 2012). Theiler does not explain how any variance "surpris[ed] [him] at trial" or "plac[ed] [him] at risk of double jeopardy." *United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010) (quoting *Robinson*, 974 F.2d at 578). Theiler's variance argument appears to be a second challenge to the sufficiency of the evidence, which the Court rejected above.

Accordingly, the Court denies Theiler's motion on this ground.

### 7. Remaining Arguments

The Court has reviewed Defendants' remaining arguments for new trial, most of which were considered and rejected at trial. *See, e.g.*, Docket No. 1055 at 10 (arguing that the Court "erroneously failed to provide Mr. Hardaway's good faith instruction"). The parties raise nothing new, and thus the Court again rejects them and finds that they do not entitle Defendants to a new trial. Nor does the "cumulative error" doctrine apply here. *E.g.*, Docket No. 1050 at 44. The bar for cumulative error is exceedingly high:

> [C]umulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness. We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that the possibility of cumulative error is often acknowledged but practically never found persuasive.

*Marchetti*, 96 F.4th at 833 (quoting *Delgado*, 672 F.3d at 344).  Defendants have not demonstrated that non-reversible errors fatally infected the trial such that "they violated the trial's fundamental fairness."  *See id.*

And finally, the Court rejects the argument that the evidence weighed heavily against the verdict.  As the Court explained in Section III.A., the evidence as a whole demonstrated that Defendants conspired to commit illegal remunerations in violation of 18 U.S.C. § 371.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions are **DENIED**.

So **ORDERED** and **SIGNED** this **8th**   day of **August, 2024.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE